**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, | Criminal Action No. 24-424 (ZNQ) |
| v. | **OPINION** |
| **JASHAWN ROBINSON**, | |
| Defendant. | |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon an Omnibus Motion filed by Defendant Jashawn Robinson ("Defendant") on September 7, 2025. ("Mot.," ECF No. 42.) The Government filed an Opposition Brief on October 17, 2025. ("Opp.," ECF No. 49.) Following limited discovery, Defendant filed a Reply Brief on February 2, 2026. ("Reply," ECF No. 57.) The Government filed a Sur-Reply Brief on February 12, 2026. ("Sur-Reply," ECF No. 59.) For the reasons set forth below, the Court will **DENY** Defendant's Motion.

I.      **BACKGROUND AND PROCEDURAL HISTORY**

On August 29, 2021, a black 2014 Ford Mustang was stolen at gunpoint in South Brunswick, New Jersey. (ECF No. 3.) The next day, Middlesex County prosecutors filed a Complaint against Defendant related to the carjacking, and a Middlesex County judge issued a warrant for Defendant's arrest. (Cerimele Decl. 09/07/2025, Ex. A (Complaint) at 1.)[1]  Around

---

[1] References to "Cerimele Decl. 09/07/2025" refer to the exhibits attached to the Certification of Ernesto Cerimele at ECF No. 42-1. References to "Gov. Ex." refer to the exhibits attached to the Government's Brief in Opposition to Defendant's pre-trial motions at ECF No. 49. References to "Cerimele Decl. 02/02/2026" refer to the exhibits attached to the Certification of Ernesto Cerimele dated February 2, 2026. This certification was not filed on the public docket.

1

the same time, a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") contacted Detective Brady Shelcusky from the South Brunswick Police Department and stated that he was interested in this case and would be pursuing federal charges. (*Id.*, Ex. B (Investigation Report) at 3.) The United States Marshals Office also informed Detective Shelcusky that it would be opening a case and actively looking for Defendant. (*Id.*)

About one month later, on September 27, 2021, members of the New York/New Jersey Regional Task Force, which included Deputy U.S. Marshals and police officers from the New York Police Department ("NYPD"), arrested Defendant. (Gov. Ex. C.) Defendant was subsequently charged in New York with possession of stolen property (the Ford Mustang) and obstruction-related offenses (the "NY Mustang charges"). (Cerimele Decl. 09/07/2025, Ex. C (NY Indictment).) He was also charged in New York on a fugitive from justice claim (the "NY Fugitive charge") related to the New Jersey carjacking charges. (Gov. Ex. E.) The next day, on September 28, 2021, Defendant appeared before the Honorable Denise Johnson, Criminal Court Judge, in the New York City Criminal Court, for an arraignment on the NY Mustang charges and the NY Fugitive charge. (Gov. Ex. F.) At the arraignment, Judge Johnson specifically advised Defendant that he would be picked up "by the state of New Jersey, following completion of his New York matter." (*Id.* at 9:16–19.) Defendant was then transferred to Rikers Island.

Starting in at least October 2021, the Government began receiving police reports related to Defendant. (Cerimele Decl. 02/02/2026, Exs. A–B.) By February 2022, federal prosecutors began coordinating with the Queens District Attorney's Office ("Queens DA's Office") to investigate Defendant. (*Id.*, Ex. E.) On February 14, 2022, an Assistant United States Attorney ("AUSA") from the Government emailed an Assistant District Attorney ("ADA") from the Queens DA's

---

Counsel for the Government and Defendant shall meet and confer to discuss any necessary redactions before filing it publicly.

Office to inquire about Defendant and to coordinate sharing evidence. (*Id.*) Two months later, on April 1, 2022, the ADA shared discovery with the AUSA pertaining to the New York charges against Defendant. (*Id.*)

While still detained at Rikers, in June 2022, Defendant was indicted by the Queens DA's Office for unrelated attempted murder and firearm charges that occurred on August 25, 2021, three days before the New Jersey carjacking. On August 4, 2022, the Government sought to unseal grand jury materials from the New York indictments, confirming that the federal investigation into Defendant was ongoing. (Cerimele Decl. 02/02/2026, Exs. G, J.) The following month, the Government filed a federal criminal Complaint against Defendant in the District of New Jersey, charging him with one count of carjacking and one count of discharging a firearm during a crime of violence. (ECF No. 1.) A federal arrest warrant for Defendant was issued the same day. (ECF No. 2.) Also that same day, the Government emailed the Queens DA's Office to facilitate Defendant's initial appearance, stating that it believed it could "writ him over to District Court" for his initial appearance on the Complaint, but noted that they could "hash this all out later." (Cerimele Decl. 02/02/2026, Ex. C.) The next day, September 15, 2022, an ATF Special Agent emailed the federal arrest warrant to Rikers to serve as a detainer.[2] (Gov. Ex. K; Cerimele Decl. 02/02/2026, Ex. L). Throughout this period, the Government continued to seek evidence from the Queens DA's office, (Cerimele Decl. 02/02/2026, Ex. M), but did not make any further attempts or inquiries to bring Defendant before the District Court.

On January 18, 2023, apparently unaware of the federal charges, Defendant pleaded guilty to two New York state offenses: fourth-degree criminal possession of stolen property (the car) and second-degree criminal possession of a weapon (the firearm). (Cerimele Decl. 09/07/2025, Ex. E

---

[2] The Court is mindful that during this time the COVID-19 pandemic had complicated the operations of law enforcement nationwide.

(Plea. Tr.) at 2:10–13.)  At the plea hearing, the Judge advised Defendant that the plea agreement was a part of a "global resolution of these matters today," ostensibly referring to the two New York state matters.[3]  (*Id.* at 2:10–13.)  The same day, the Queens DA's Office informed the Government that Defendant accepted the plea offers.  (Cerimele Decl. 02/02/2026, Ex. N.)  The Government requested a copy of the plea transcript and sought contact information for New York Police Department ("NYPD") detectives to pursue additional cell phone data.  (*Id.*)  Following the plea, Defendant was sentenced to three and a half years on the firearm offense and 364 days on the stolen vehicle offense, with the sentences to run concurrently.  (Gov. Ex. L at 4:17–22.)  On March 9, 2023, Defendant entered Sing Sing Correctional Facility in New York ("Sing Sing").  (Cerimele Decl. 09/07/2025, Ex. F (NYSDOC Incarcerated Lookup).)

Even after Defendant's sentencing, the Government continued to seek cell phone data from the Queens DA's Office to use in its grand jury presentation.  (Cerimele Decl. 02/02/2026, Ex. O.)  On April 26, 2023, an ADA emailed the contact information of the two detectives with the NYPD who would be able to assist the Government with obtaining the relevant phone records.  (*Id.*)  It appears that the Government received the cell phone records in July 2023.  (Cerimele Decl. 02/02/2026, Ex. R.)  The next month, the Government issued a subpoena to the New York State ("NYSDOC") Department of Corrections to obtain additional phone records related to Defendant.  (Cerimele Decl. 02/02/2026, Ex. S.)  It is not clear from the evidence before the Court if, or when, the NYSDOC responded to the subpoena, or if the Government took any other investigative steps.

---

[3] Defendant argues that the Court's reference to a "global resolution" suggests a resolution of all the charges brought against Defendant related to the carjacking, including charges from New York, New Jersey, and federal authorities. (Mot. at 7.)  That interpretation is contradicted by the record, which establishes that the Court was referring to the multiple New York state indictments filed against Defendant.  Indeed, prior to the global resolution statement, Defendant was informed that the plea hearing was related to the two pending New York indictments. (Cerimele Decl. 09/07/2025, Ex. E (Plea. Tr.) at 2:1–4) ("Calling number ten and 22, Indictment 70820 of '22 and 71949 of '22, Jashawn Robinson, defendant is incarcerated, being produced for this calendar call.")  The Judge then immediately stated that he understood there may be a "global resolution of *these* matters," clearly referencing the two New York indictments. (*Id.* at 2:10–13.)

About ten months after issuing the subpoena, on June 27, 2024, the Government presented its case to a grand jury, which returned an Indictment charging Defendant with carjacking (Count One) and discharging a firearm during and in relation to a crime of violence (Count Two).  (ECF No. 3.)  During the grand jury presentation, an ATF Special Agent testified, among other things, about Defendant's New York state guilty plea.  (Cerimele Decl. 09/07/2025, Ex. G (GJ Tr.) at 28:16–21.)  On July 10, 2024, in response to a Writ sent by the Government and signed by the Court, Defendant was produced for his initial appearance and arraignment on the federal Indictment.  (ECF Nos. 5–6.)  Upon his arrival to federal court, Defendant was arrested on the federal arrest warrant.  Following his arraignment, Defendant was returned to Sing Sing to finish his New York sentence.  On March 27, 2025, after having served his entire sentence, Defendant was released from Sing Sing and rolled into U.S. Marshal's custody on the federal Indictment.  (Cerimele Decl. 09/07/2025, Ex. F (NYSDOC Incarcerated Lookup) at 3.)

## II.      SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 3231.

## III.     DISCUSSION

Defendant asserts that the Government violated Federal Rule of Criminal Procedure 5, the Interstate Agreement on Detainers Act ("IADA"), the Speedy Trial Act ("STA"), and the Due Process Clause.[4]  The Court will address each argument in turn.

---

[4] Defendant also raises, for the first time in his Reply Brief, a claim that his Sixth Amendment right to a speedy trial was violated.  That argument is without merit.  It has long been established that "only a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections of that provision." *United States v. Lovasco*, 431 U.S. 783, 788–89 (1977) (citation modified). Defendant's Sixth Amendment argument concerns only the period preceding the Government's securing of an Indictment.  Given that the pre-indictment period does not implicate Defendant's Sixth Amendment right, his Sixth Amendment rights were not violated.

### A.      FED. R. CRIM. P. 5

Federal Rule of Criminal Procedure 5(a) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge[.]" Fed. R. Crim. P. 5(a)(1)(A).  The so-called "presentment" requirement in Rule 5(a) has long been a feature of the judicial system, designed "to prevent secret detention and [] to inform a suspect of the charges against him." *Corley v. United States*, 556 U.S. 303, 306 (2009).  Under the *McNabb-Mallory* rule, "confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a)" are inadmissible in evidence.  *Id.*

Rule 5, of course, is a rule of *federal* procedure, and does not apply to individuals who were arrested on *state* charges and are in *state* custody.  *See United States v. Fredericks*, 684 F. App'x 149, 156 (3d Cir. 2017) (defendant's statement was made while in local custody, so presentment requirement under Rule 5(a) did not apply); *see also United States v. Alvarez-Sanchez*, 511 U.S. 350, 359 (1994) ("In this case, respondent was under arrest on *state* narcotics charges at the time he made his inculpatory statement to the Secret Service agents.  The terms of § 3501(c) thus did not come into play until respondent was arrested by the agents on a federal charge—*after* he made the statement.); *Casey v. United States*, 100 F.4th 34, 45 (1st Cir. 2024) ("Rule 5's requirement of prompt presentment applies only to a period of federal detention.").  Even if federal and state authorities have overlapping interests, Rule 5 is not implicated if the defendant remains under state jurisdiction.  *See, e.g., United States v. Hall*, 152 F.3d 381, 426 (5th Cir. 1998) (defendant was in the custody solely on state charges, though a separate warrant had been issued based on a federal complaint), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304, 310-11 (2000); *United States v. Barlow*, 693 F.2d 954, 957–59 (6th Cir. 1982) (defendant's interview by the FBI occurred while he was in state custody following arrest on a state charge); *United States v. Watson*, 591 F.2d 1058, 1062 (5th Cir. 1979) (per curiam) (confession to

FBI agent who had obtained a federal arrest warrant occurred while defendant was in state custody on state charges).  An exception to this rule is when there is "improper collaboration" between state and federal officials.  *United States v. Byrd*, Cr. No. 21-2613, 2022 WL 3666309, at *2 (3d Cir. Aug. 25, 2022).  However, "cooperation between law enforcement agencies" does not necessarily mean that they have been collaborating improperly.  *Id.* (explaining that improper collaboration may occur when officials conspire to deny a defendant his rights, when the state charge is effectively a federal detention, or when the state charge is a ploy to support the federal charge and secure a confession).

Here, New Jersey issued an arrest warrant for Defendant on August 30, 2021.  (Cerimele Decl. 09/07/2025, Ex. A.)  Pursuant to that warrant, Defendant was arrested on September 27, 2021, by the Regional Task Force, which included federal agents.  (Gov. Ex. C; Gov. Ex. D at 9.)  However, at the time of Defendant's arrest, no federal charges had been filed against him, and he was subsequently turned over to the sole custody of New York authorities, who held Defendant in detention pursuant to New York charges.  (Cerimele Decl. 09/07/2025, Ex. C.)  Rule 5 thus had no application at the time of Defendant's arrest in September 2021.  *See Fredericks*, 684 F. App'x at 156.

It was not until a year after his arrest, on September 14, 2022, that the Government filed a federal Complaint against Defendant.  (ECF No. 1.)  But even the filing of the federal Complaint did not trigger Rule 5, because at that time, Defendant had not been arrested by federal authorities and was in state custody.  The plain terms of Rule 5 are only triggered upon an "arrest," which had not yet happened because Defendant was being detained by state authorities on the state charges. Nor does it matter that Defendant was arrested, in part, by federal authorities in September 2021. That arrest was made pursuant to a state arrest warrant and had no connection to the federal Complaint that was filed by the Government over a year a later.  *See Hall*, 152 F.3d at 426 (5th

Cir. 1998) ("The fact that a federal complaint and warrant had been issued charging [the defendant] with flight from prosecution at the time that he was taken into custody does not change the fact that [the defendant] was in custody solely on state charges.").

It was not until two years later, on July 27, 2024, that a federal grand jury returned an Indictment against Defendant.  (ECF No. 3.)  He was ultimately arrested by federal authorities on July 10, 2024, and at that point Rule 5 became applicable.  Defendant, however, had his initial appearance and arraignment the same day as his federal arrest.  (ECF No. 6.)  As such, there can be no question that the Government complied with Rule 5's requirement to "take the defendant without unnecessary delay" before a federal judge.  Fed. R. Crim. P. 5(a)(1)(A).

Defendant asserts that federal authorities allowed him to remain in state custody while they obtained "additional investigative leverage" in contravention of Rule 5's presentment requirement. (Mot. at 6.)  In support of this argument, Defendant cites an August 29, 2021, report filed by Detective Shelcusky stating that federal authorities were "interested in this case" and would "be pursuing federal charges."  (*Id.*)

As explained above, "improper collaboration between federal and state or local officers" may trigger Rule 5 even when a defendant is held in state custody.  *Alvarez-Sanchez*, 511 U.S. at 359.  To prevail on this theory, "a defendant must show that federal law enforcement deliberately sought to use the custody of another party to circumvent presentment, usually for the purpose of prolonging its own opportunity to gather evidence."  *United States v. Pahlawan*, Cr. No. 24-41, 2025 WL 1239354, at *57 (E.D. Va. April 29, 2025).  Because cooperation between state and federal law enforcement is not, by itself, improper collaboration, the Court must distinguish permissible coordination from impermissible coordination.

Courts have identified several circumstances that may cross that line.  Persistent interrogation by federal agents of a person held in state custody for an inherently federal offense

may constitute improper collaboration.  *See Anderson v. United States*, 318 U.S. 350, 356 (1942) (finding the existence of a working arrangement between state and federal authorities where the defendants were in state custody, the FBI questioned the defendants until they confessed, the offense was inherently federal from the outset, and the state's role appeared limited to assisting the FBI).  Improper collaboration may also arise where state authorities act at the direction or behest of federal agents.  *See United States v. Broadhead*, 413 F.2d 1351, 1358 (7th Cir. 1969) (holding that Rule 5 applied because the state arrest was performed at the behest of the FBI, the lineup was conducted by the FBI, and the FBI used the local jail as a temporary detention site). Finally, improper collaboration may exist where federal agents interview a defendant who is being unlawfully detained by state officials to aid a federal investigation, and the agents know or should know of the illegality of that detention.  *See United States v. Tupper*, 168 F. Supp. 907, 911 (W.D. Mo. 1958).

With this framework in mind, Defendant has not met his burden of establishing improper collaboration between federal and state officials.  Here, federal and state authorities jointly arrested Defendant pursuant to a valid state arrest warrant.  (Gov. Exs. B–C.)  This case therefore does not present a scenario in which state officials were acting at the direction or behest of federal agents. Nor is there anything improper about federal officers coordinating with state authorities to make an arrest, particularly where, as here, the suspect is alleged to have engaged in violent conduct. Routine cooperation of this kind does not amount to the sort of deliberate circumvention of presentment that Rule 5 prohibits.  To the contrary, any type of cooperation between federal and state authorities that advances legitimate law enforcement and public safety objectives is both expected and appropriate, and should be encouraged by federal courts.

Moreover, Defendant was detained by state authorities pursuant to state criminal charges. The fact that federal authorities were conducting a parallel investigation into Defendant does not

mean that Defendant's detention by state officials was done for the purpose of circumventing Rule 5. *See Alvarez-Sanchez*, 511 U.S. at 359 (no improper collaboration where the defendant made inculpatory statements to federal authorities while in state custody); *United States v. Coppola*, 281 F.2d 340, 344–45 (2d Cir. 1960) (holding that "the mere fact that two or more agencies have the same crime or the same suspects on their books and that they are cooperating to achieve a solution" does not render that cooperation improper). Indeed, it has long been established that federal courts should be careful not to inhibit this type of cooperation. *See Chadwick*, 415 F.2d at 171 ("The courts have been careful not to unduly interfere with cooperative activities of state and federal law enforcement officers[.]").

Nor is this a case in which federal authorities questioned Defendant while he was in state custody in an effort to circumvent the procedural protections of Rule 5. Indeed, there is no evidence that federal authorities questioned Defendant at all during his state detention. The mere exchange of information between federal and state authorities does not, without more, constitute improper collaboration. Absent evidence that federal and state authorities improperly collaborated "to achieve an unlawful end," the Court cannot conclude that Rule 5 was violated. *See Coppola*, 281 F.2d at 345.

## B.    INTERSTATE AGREEMENT ON DETAINERS ACT

Defendant also argues that the Government violated the Interstate Agreement on Detainers Act ("IADA"), codified at 18 U.S.C. App. 2 § 2. (Mot. at 9.) "The IADA codifies an agreement that 48 states (including New Jersey), the District of Columbia, and the Federal Government have entered." *Munez v. United States*, 462 F. App'x 172, 174 (3d Cir. 2011). An integral part of the IADA is the notice requirement contained in Article III(c). This provision is triggered "if a State (the 'receiving State') lodges a detainer against a prisoner held in another State (the 'sending State')." *United States v. Lualemaga*, 280 F.3d 1260, 1263 (9th Cir. 2002) (citation modified).

When that happens, "the sending State must notify the prisoner of the detainer and of his or her rights under the [IADA]." *Id.* Article III(c) reads in full:

> The [sending State's] warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based.

18 U.S.C. App. 2, § 2, Art. III(c). After a defendant has received notice of the detainer, he may request a final disposition of the pending indictment, information, or complaint currently pending in the other state. That request must be delivered to, and received by, "the court and prosecuting officer of the jurisdiction that lodged the detainer against him." *Fex v. Michigan*, 507 U.S. 43, 52 (1993). Once the court and prosecuting officer have received the request, a trial must begin within 180 days unless the matter is resolved without a trial or a statutory exception applies. *See* 18 U.S.C. App. 2, § 2, Art. III(a). If the defendant is not brought to trial within 180 days, then the court "shall enter an order dismissing the [indictment, information, or complaint] with prejudice, and any detainer based thereon shall cease to be of any force or effect." 18 U.S.C. App. 2, § 2, Art. V(c).

As an initial matter, the Court must determine whether Defendant was advised of his rights under the IADA. In a signed certification, Defendant contends that he "was never served with a copy of New Jersey State charges or a federal Complaint while in custody in New York." ("Robinson Decl.," ECF No. 42-2 ¶ 5.) The Government, in contrast, argues that on April 6, 2023, about a month after Defendant's arrival at Sing Sing, he was provided with a copy of the federal arrest warrant and a letter advising him of his right to a speedy trial. (Opp. at 16; *see also* Gov. Ex. M.) Defendant maintains that the April 6, 2023 letter (the "Letter") is insufficient to establish notice under the IADA. (Reply at 11–13.) Specifically, Defendant argues that the Letter

referenced the detainer only in passing, is vague and confusing, and does not demonstrate that he actually received notice of his rights under the IADA. (*Id.*)  The Court agrees.

Nothing on the face of the Letter establishes Defendant was advised of his rights under the IADA.  The Letter is not even addressed to Defendant, but is instead directed to the "United States District Court."  (Gov. Ex. M.)  Although the Letter indicates that Defendant was "cc'd", that notation alone does not establish that he actually received a copy.  More importantly, the record lacks any indicia of  receipt of service, such as a certificate of service, inmate acknowledgement, institutional log entry, signed receipt, or any other documentation demonstrating that Defendant received either the Letter or was advised of his rights under the IADA.  While it is certainly possible that Defendant received the Letter, the Court cannot so conclude on this record.  Absent evidence of actual notice of the detainer and the attendant rights, the Court finds that the IADA's notice provision was violated.

Defendant maintains that this violation warrants dismissal of the Indictment.  (Mot. at 12.)  The IADA, however, authorizes dismissal only in certain situations, none of which are present here.  As explained in *United States v. Pena-Corea*, the IADA provides for dismissal in the following situations:

> (1) if, after a prisoner has made the required request pursuant to Article III, trial does not occur within the required 180 days;
> (2) when trial does not occur before the prisoner, having been transferred to the receiving state, is sent back to the sending state; or
> (3) when the receiving state fails or refuses to accept temporary custody of the prisoner.

165 F.3d 819, 822 (11th Cir. 1999).  None of those scenarios are applicable here and this Court may not expand this statutory list through judicial decree; such matters are better left to the sound discretion of the legislature.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 284 n.38 (1994) ("We are not free to fashion remedies that Congress has specifically chosen not to extend.").

Moreover, the violation is not attributable to the Government. Once the Government lodged the detainer with the state custodian, the obligation shifted to the custodian to advise Defendant of his rights under the IADA. Under these circumstances, dismissal of the indictment is not an available remedy under the statute and would therefore be inappropriate. *See Pena-Corea*, 165 F.3d at 821–22 (11th Cir. 1999); *see also Lualemaga*, 280 F.3d at 1265 ("[W]e hold that dismissal of an indictment is not an available form of relief where the notice requirement of the IAD is violated, even when that violation is attributable to the receiving State, here the United States."); *United States v. Walker*, 255 F.3d 540, 543 (8th Cir. 2001) (holding that dismissal of the indictment is not an appropriate remedy for a violation of the notice provision of the IADA); *Lara v. Johnson*, 141 F.3d 239, 243 (5th Cir. 1998) (holding that "it would be distasteful" to dismiss the indictment due to the sending state's negligence).

### C.    SPEEDY TRIAL ACT

Defendant next asserts that the Government violated Section 3161(j) of the Speedy Trial Act ("STA").[5] (Mot. at 13.) That statue provides:

> If the attorney for the Government knows that a person ***charged with an offense*** is serving a term of imprisonment in any penal institution, he shall promptly--
>
> (A) undertake to obtain the presence of the prisoner for trial; or
> (B) ***cause a detainer to be filed*** with the person having custody of the prisoner and request him to so advise the prisoner and to ***advise the prisoner of his right to demand trial***.

18 U.S.C. § 3161(j)(1) (emphasis added).

---

[5] Defendant does not assert that the Government violated 18 U.S.C. § 3161(b), which requires dismissal of an Indictment if it is not filed within 30 days of an arrest made in connection with such charges. Nor could he, because Defendant was arrested on New Jersey state charges and then detained in New York on the New York charges. The 30-day limitations period under Section 3161(b) was therefore inapplicable.

According to Defendant, after his sentencing on the New York state charges on February 8, 2023, the Government neither produced him in federal court nor ensured that he was informed of the detainer or his right to demand trial. (Mot. at 13.)  The Government responds that Defendant received both a copy of the federal arrest warrant and the Letter advising him of his rights. (Opp. at 20.)  The Government further contends that even if Defendant was not informed of his rights, that failure would lie with Sing Sing, rather than the Government, and dismissal of the indictment would therefore be unwarranted.  (*Id.* at 20.)  In a footnote, the Government also asserts that it remains "unsettled" in the Third Circuit as to whether the filing of a criminal complaint, absent an arrest, triggers the notice provision of Section 3161(j). (Opp. at 19 n.6.)

The threshold question for the Court, then, is whether the filing of a federal criminal complaint rendered Defendant "charged with an offense" at the time of his imprisonment at Sing Sing.  In support of its position, the Government cites several out-of-circuit decisions suggesting that only the filing of an indictment or information triggers the STA's notice provision under Section 3161(j). (Opp. at 19 n.6.)  To the extent those decisions hold that Section 3161(j) is triggered exclusively by the filing of an indictment or information, this Court declines to follow them.

In interpreting the scope of the phrase "charged with an offense," the Court begins with the ordinary meaning of the individual terms.  *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *see also United States v. Hopkins*, 106 F.4th 280, 289 (3d Cir. 2024) ("When interpreting a statute, a court should always turn first to one, cardinal canon before all others: that courts must presume that a legislature says in a statute what it means, and means in a statute what it says there.") (citation modified).  As a starting point, the STA defines the term "offense" as "any

14

Federal criminal offense which is in violation of any Act of Congress and is triable by any court established by Act of Congress." 18 U.S.C. § 3172(2). This definition aligns with the term's longstanding usage. *See Gamble v. United States*, 587 U.S. 678, 684 (2019) ("[T]he term 'offence' was commonly understood in 1791 to mean 'transgression,' that is, 'the Violation or Breaking of a Law.'") (citation modified). A "charge," in turn, is "a formal accusation of an offense as a preliminary step to prosecution." *Charge*, Black's Law Dictionary (12th ed. 2024); *see also Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 408 (2008) (Thomas, J., dissenting) ("In criminal law, for example, a charge is defined as a formal accusation of an offense as a preliminary step to prosecution.") (citation modified). Read together, the phrase "charged with an offense" denotes the existence of a formal accusation that an individual has violated an Act of Congress that is triable by any court established by Act of Congress.

With that definition in mind, it is clear an individual is "charged with an offense" upon the filing a federal criminal complaint. The text of the STA, the Federal Rules of Criminal Procedure, and Supreme Court precedent all support this conclusion. Starting with the text of the STA, "[t]his Court adheres to the general principle that Congress' use of 'explicit language' in one provision 'cautions against inferring' the same limitation in another provision." *State Farm Fire and Cas. Co. v. U.S. ex rel. Rigsby*, 580 U.S. 26, 34 (2016). The STA uses precise language when it intends to limit a provision to indictments or informations. For example, the timing provision in Section 3161(b) applies specifically to "any information or indictment," whereas the notice provision in Section 3161(j) employs broader language, applying to any person "charged with an offense." 18 U.S.C. § 3161. Had Congress intended Section 3161(j) to be limited to indictments or informations, it could have said so. Its decision not to do so strongly indicates that the phrase "charged with an offense" should not be limited to indictments or informations.

Next, the ordinary meaning and understanding of a federal criminal complaint confirms that it is a formal accusation that an individual has violated the law.  Under the Federal Rules of Criminal Procedure, "[t]he complaint is a written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 3.  The complaint "must be made under oath before a magistrate judge or, if none is reasonably available, before a state or local judicial officer." *Id.*  A complaint therefore states that an individual has violated the law, and the requirement that it be made under oath before a judge certainly suggests that it is a formal accusation.  This interpretation is further supported by Rule 4, which allows for the issuance of an arrest warrant based upon a finding of probable cause in the complaint. *See* Fed. R. Crim. P. 4.  If a complaint was not a formal accusation that an individual has violated the law, then the issuance of an arrest warrant on that basis would be in tension with the Fourth Amendment's protections against unreasonable searches and seizures. *See Gaither v. United States*, 413 F.2d 1061, 1075 (D.C. Cir. 1969) (holding that federal criminal complaints "play an important role" in safeguarding Fourth Amendment rights).

Supreme Court precedent likewise confirms this understanding.  As explained in *Carchman v. Nash*, "[t]he most natural interpretation of the words 'indictment,' 'information,' and 'complaint' is that they refer to documents charging an individual with having committed a criminal offense." 473 U.S. 716, 724 (1985).  And long before that, the Supreme Court recognized that criminal proceedings are instituted when a formal charge is made "either by indictment presented or information filed in court, or, at the least, by complaint before a magistrate." *Post v. United States*, 161 U.S. 583, 587 (1896).  Together, these authorities confirm that the filing of a criminal complaint renders an individual "charged with an offense" within the meaning of Section 3161(j).

The cases cited by the Government do not compel a contrary conclusion.  Both *United States v. Bloom*, 865 F.2d 485 (2d Cir. 1989), and *United States v. Johnson*, 815 F.2d 309 (5th Cir.

1987), involved the interpretation of the timing provision of § 3161(b), which, as noted above, applies only to an "information or indictment."  The Government also cites a single unpublished Ninth Circuit decision holding that Section 3161(j) is not triggered by the filing of a criminal complaint.  In *United States v. Tenijieth* the court summarily reasoned that a "person charged with an offense" refers only to an individual against whom an information or indictment has been filed. 35 F.3d 573, at *1 (9th Cir. 1994) (unpublished).  That reasoning, however, relied on *Bloom* and *Johnson*, neither of which addressed the notice provision in § 3161(j).  As explained above, § 3161(j) uses broader language than § 3161(b), applying to any person "charged with an offense," without limiting that term to indictments or informations.  Any holding otherwise would be inconsistent with the plain language and structure of the STA.

Turning to the merits of Defendant's STA claim, the Government argues that no violation occurred because it requested that a detainer be lodged against Defendant. (Opp. at 20.)  According to the Government, once the detainer was filed, the responsibility to notify Defendant shifted to the warden of the correctional facility. (*Id.*)  The Government further contends that the NYSDOC provided Defendant with a copy of the Letter, which it asserts advised him of his rights under the STA. (*Id.*)

As previously explained, the Letter is insufficient to establish that Defendant actually received notice of the detainer or was informed of his right to a speedy trial.  The record contains no certificate of service, inmate acknowledgment, institutional log entry, signed receipt, or any other documentation demonstrating that Defendant received the Letter or was advised of his STA rights.  Moreover, the record establishes that the Government did not request that the NYSDOC advise Defendant of his rights under the STA.  Section 3161(j)(1)(B) requires the Government to both file a detainer with the person having custody of the prisoner *and* request that the custodian inform the prisoner of the detainer and of his right to demand trial.  18 U.S.C. § 3161(j)(1)(B).

17

Here, although the Government filed the detainer with the NYSDOC, it failed to request that the NYSDOC advise Defendant of the detainer and of his right to demand trial.  In an email to the NYSDOC, a Special Agent with the ATF simply attached a copy of the federal arrest warrant and wrote: "Please see the attached Federal arrest warrant to serve as a detainer for [Defendant]." (Gov. Ex. K.)  Nowhere in the email did the Government request that NYSDOC inform Defendant of the detainer or of his right to demand trial. Accordingly, the Government did not comply with the notice provision of the STA.

Like the IADA violation, Defendant contends that dismissal of the Indictment is the only appropriate remedy for the STA violation.  However, as with the IADA, the STA provides no specific remedy for a violation of § 3161(j).  Although the Third Circuit has not addressed this precise issue, several Courts of Appeals have held that dismissal of the indictment is not an appropriate remedy for a § 3161(j) violation. *See United States v. Guzman,* 85 F.3d 823, 829 n.4 (1st Cir.1996) ("[T]he law is pellucid that the dismissal of an indictment is not a suitable remedy for a violation of 18 U.S.C. § 3161(j)."); *United States v. Lainez-Leiva*, 129 F.3d 89, 91 (2d Cir. 1997) (joining the other circuits in holding that dismissal of the indictment is not an authorized remedy for a violation of § 3161(j)); *United States v. Anderton,* 752 F.2d 1005, 1008 (5th Cir. 1985) ("§ 3162 does *not* provide for dismissal in the event of violation of § 3161(j)(1).); *United States v. Robinson*, 455 F.3d 602, 606 (6th Cir. 2006) (holding that "numerous courts" have held that dismissal of the indictment is not an appropriate remedy for a violation of § 3161(j)); *United States v. Dawn,* 900 F.2d 1132, 1135-36 (7th Cir. 1990) ("Every court to address the issue has agreed that dismissal of the indictment is not an available remedy for violations of § 3161(j)");*United States v. Walker*, 255 F.3d 540, 542 (8th Cir. 2001) (holding that dismissal of the indictment is not authorized for violations of § 3161(j)); *United States v. Valentine*, 783 F.2d 1413, 1415 (9th Cir. 1986) ("The language of the Speedy Trial Act clearly dictates that dismissal of an

indictment is not a remedy for a violation of § 3161(j)(1).”); *United States v. Cone*, 310 F. App’x 212, 215 (10th Cir. 2008) (“In short, the language of § 3162(a) contains no ambiguities that might allow its sanctions to be imposed for a violation of § 3161(j).”) (citation modified).

Although not binding, this Court is persuaded by the reasoning of the other Courts of Appeals that clearly found dismissal is unwarranted under these circumstances.  Because the remedy Defendant seeks is not available, “[t]hat ends the debate, regardless of any sympathy [the Court] may have for his circumstances.”  *Cone*, 310 F. App’x at 215.

## D.   DUE PROCESS CLAUSE

The Fifth Amendment’s Due Process Clause safeguards defendants against oppressive delays in bringing an indictment, even when such delays occur within the applicable statute of limitations.  *See United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985).  To obtain dismissal of an indictment pursuant to the Due Process Clause based on pre-indictment delay, the defendant must establish: “(1) that the government intentionally delayed bringing the indictment in order to gain some advantage over him, and that (2) this intentional delay caused the defendant actual prejudice.”  *United States v. Ismaili*, 828 F.2d 153, 167 (3d Cir. 1987).  Due Process does not require a prosecutor to file charges as soon as he or she has established that probable cause exists, or even once he or she has enough evidence to prove guilt beyond a reasonable doubt.  *See United States v. Lovasco*, 431 U.S. 783, 792 (1977).  Nor is a delay due to a lack of prosecutorial diligence sufficient to establish a violation of the Due Process clause.  *See Sebetich*, 776 F.2d at 430; *see also United States v. Baxt*, 74 F. Supp. 2d 425, 431 (D.N.J. 1999) (finding no Due Process violation despite a four-year delay where the Government’s progress was impeded by competing obligations and administrative burdens).

The evidence presented by both Defendant and the Government confirms that the Government’s conduct prior to securing the Indictment was not done in bad faith or to obtain a

tactical advantage over Defendant.  On the contrary, the evidence presented before the Court establishes that the Government was investigating Defendant throughout his detention at Sing Sing and well-after the filing of the federal criminal complaint.  Beginning in at least February 2022, the Government started coordinating with the Queens DA's Office to investigate Defendant for carjacking and other related offenses.  (Cerimele Decl. 09/07/2025, Ex. I.)  That coordination involved the Government requesting discovery from the Queens ADA related to the pending New York state charges.  (*Id.*)  In August 2022, the Government filed applications to unseal and authorize the limited disclosure of New York grand jury materials related to Defendant.  (Cerimele Decl. 09/07/2025, Ex. J.)  This coordination continued in December 2022, after the filing of the federal Complaint, when the Queens DA's Office shared a discovery file with the Government.  (Cerimele Decl. 09/07/2025, Ex. M.)

Even on the day of Defendant's plea in New York, January 18, 2023, the Government continued to seek evidence related to Defendant, specifically requesting cell phone extractions that the NYPD had in its possession.  (Cerimele Decl. 09/07/2025, Ex. N.)  Ultimately, that information was not provided to the Government until July 20, 2023.  (Cerimele Decl. 09/07/2025, Ex. R.)  In August 2023, the Government also requested the phone records of Defendant from the NYSDOC.  (Cerimele Decl. 09/07/2025, Ex. S.)  After August 2023, it is unclear as to whether the NYSDOC responded to the subpoena, or whether the Government continued pursuing other investigative leads.  Ultimately, Defendant was indicted 10 months later, on June 27, 2024, and had his initial appearance and arraignment on July 10, 2024.

Based on the foregoing, it is clear that the Government was actively investigating Defendant while he was in New York custody.  Even after the filing of the federal Complaint, the Government continued to seek discovery and other evidence to determine whether to pursue an indictment.  Although Defendant argues that the delay between the Government's filing of the

20

Complaint and the return of an Indictment lacks any "plausible justification" (Reply at 13), it is clear from the evidence before the Court that the Government was actively pursuing additional information related to its investigation. As the Supreme Court has explained, prosecutors are under no obligation to file charges as soon as they possess sufficient evidence to establish guilt beyond a reasonable doubt. *See Lovasco*, 431 U.S. at 792 (holding that an "investigative delay is fundamentally unlike" a delay sought to obtain tactical advantage). Here, the Government continued investigating Defendant and collecting evidence from multiple sources throughout his detention and incarceration in New York. This investigation of Defendant continued even after the filing of the federal Complaint and Defendant's guilty plea. That this process took longer than Defendant would have preferred does not establish a violation of his Due Process rights. Federal prosecutions are often complex, and the decision whether and when to seek an indictment is one that is best left to the discretion of the Government. It is not the role of this Court to speed up or rush that investigative process, particularly when someone's liberty interests are at stake.

Defendant further argues that the only plausible explanation for the delay is that the Government was awaiting his guilty plea in state court to strengthen its federal case. (Mot. at 16.) That contention, however, is squarely contradicted by the record. The evidence demonstrates that, even after Defendant entered his plea, the Government continued to obtain additional phone records and pursue other investigative leads—conduct that is inconsistent with a strategy of simply waiting to leverage Defendant's plea. More broadly, the record reflects that the Government sought evidence from multiple independent sources in order to establish Defendant's alleged criminal conduct. Defendant's state-court guilty plea was, at most, one component of a far more extensive investigation, not its centerpiece. The timing of the Indictment thus aligns with the Government's ongoing efforts to develop a more complete evidentiary record, rather than any improper attempt to capitalize on the plea.

The nature of the evidence the Government continued to pursue further undermines Defendant's theory.  Materials such as phone records and other third-party evidence are objective and independently verifiable; they do not depend on Defendant's admissions and therefore have intrinsic investigative value regardless of any plea.  This continued evidence-gathering is emblematic of permissible investigative delay, not bad-faith manipulation.  Critically, Defendant has not identified a single piece of evidence suggesting that the Government acted in bad faith or for the purpose of gaining a tactical advantage.  Nor has he shown that the timing of the Indictment was driven by anything other than legitimate investigative considerations.  Absent such a showing, Defendant's speculation cannot sustain a due process claim.[6]

### E.      OTHER REMEDIES

Defendant alternatively argues that, if dismissal is not warranted, the Court should suppress (1) a post-arrest statement Defendant made to law enforcement after his arrest on September 27, 2021; and (2) his testimony and allocution made under oath during his plea hearing on the New York charges.  (Mot. at 19–21.)  In support, Defendant relies solely on Rule 5 and the *McNabb–Mallory* doctrine discussed above.  Because the Court has already concluded that the Government did not violate Rule 5, there is no basis to suppress any evidence based on that doctrine.

As a separate but related matter, it is unclear from this record whether the Government intends to introduce at trial Defendant's post-arrest statements and guilty plea testimony in New York in its case-in-chief or otherwise.  If it does, it is likewise unclear whether Defendant is seeking to suppress that evidence given the timing of those statements and the belated notice of the federal charges.  Accordingly, the parties are to meet and confer and file a letter by April 22,

---

[6] Because the Court does not find that the Government intentionally delayed bringing the Indictment to gain an advantage over Defendant, the Court does not reach whether Defendant was prejudiced by the delay.

2026, advising the Court as to whether the parties have reached an agreement or whether supplemental briefing on this particular issue is appropriate, with a proposed briefing schedule.

## IV.     <u>CONCLUSION</u>

For the reasons stated above, the Court will **DENY** Defendant's Motion.  An appropriate Order will follow.

Date: April 9, 2026

s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
